IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| PAMELA JEAN MILEY, | ) | Case No. 1:20-cv-2550 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER**[1] |
| Defendant. | ) | |

Plaintiff, Pamela Jean Miley, seeks judicial review of the final decision of the Commissioner of Social Security, denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act.  Miley challenges as a violation of separation of powers the structure of the Social Security Administration ("SSA"), because, under 42 U.S.C. § 902(a)(3), the Commissioner does not serve at the will of the president.  Miley additionally argues that the Administrative Law Judge ("ALJ"): (i) failed to adequately explain his findings at Step Three of the sequential evaluation process; (ii) failed to analyze Listing 8.04; and (iii) misevaluated the opinion evidence and her subjective symptom complaints.  However, Miley lacks standing to contest the constitutionality of the ALJ's decision based on the president's removal authority.  And because the ALJ applied

---

[1] This matter is before the court pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3); and the parties consented to the jurisdiction of the magistrate judge under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  ECF Doc. 15.

proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Miley's applications for DIB and SSI must be affirmed.

## I.     Procedural History

Miley applied for DIB and SSI on August 22, 2017.  (Tr. 212, 215)[2]; *see* (Tr. 15, 75, 88, 102, 114).[3]  Miley alleged that she became disabled on July 24, 2017, due to: "1. coronary heart disease; 2. hypertension; [and] 3. coronary artery disease."  (Tr. 212, 215, 247).  The SSA denied Miley's applications initially and upon reconsideration.  (Tr. 74-85, 87-99, 101-24).  Miley then requested an administrative hearing.  (Tr. 159).

ALJ Deborah Sanders heard Miley's case on November 18, 2019 and denied the claim in a February 13, 2020 decision.  (Tr. 15-27, 34-73).  In doing so, the ALJ determined at Step Three of the sequential evaluation process that Miley's impairments did not meet or equal a listed impairment, including Listings 3.02 and 4.04.  (Tr. 19).  At Step Four, the ALJ determined that Miley had the residual functional capacity ("RFC") to perform light work, except that:

> [Miley] can frequently climb ramps and stairs; occasionally climb, ladders ropes, or scaffolds; can frequently kneel, crouch, and crawl; never work at unprotected heights or around dangerous machinery; and can never operate a motor vehicle. [Miley] can perform low stress work, defined as simple, routine, repetitive tasks, but not at a fast production rate and no strict production quotas.

(Tr. 19).

Based on vocational expert testimony that an individual with Miley's age, experience, and RFC could work in such representative occupations as garment folder, small parts assembler,

---

[2] The administrative transcript appears in ECF Doc. 11.

[3] The administrative decisions all state that Miley filed her DIB and SSI applications on August 22, 2017. (Tr. 15, 75, 88, 102, 114).  However, the DIB application indicates that it was filed on August 28, 2017, the SSI application indicates that it was filed on November 1, 2017, Miley cites November 1, 2017 as the filing date for both applications, and the Commissioner just cites "August 2017."  ECF Doc. 12 at 2; ECF Doc. 18 at 2; (Tr. 210, 215).  Because both parties agree the applications were filed together and the near three-month disparity isn't material, the court assumes, consistent with the administrative decisions, that they were filed on August 22, 2017.

and counter clerk, the ALJ determined that Miley wasn't disabled.  (Tr. 26-27).  On September

11, 2020, the Appeals Council denied further review, rendering the ALJ's decision the final

decision of the Commissioner.  (Tr. 1-3).  On November 12, 2020, Miley filed a complaint to

obtain judicial review.  ECF Doc. 1.

## II.  Evidence

### A.  Personal, Educational, and Vocational Evidence

Miley was born on March 3, 1971 and was 46 years old on the alleged onset date.  (Tr.

74, 212, 215).  She graduated from high school in 1989 and had past work as an equipment

operator, hand packer, and inspector, which the ALJ determined she was unable to perform.  (Tr.

25-26, 248, 256).

### B.  Relevant Medical Evidence

On February 10, 2017, Miley was admitted to University Hospitals Samaritan Medical

Center's emergency department to evaluate chest pressure that began the night before.  (Tr. 345).

She'd felt the same pressure when she had a heart attack in 2011, for which a stent had been

placed.  *Id.*  The hospital records noted that she was hypertensive and had a history of

hypertension, hypercholesterolemia, gastroesophageal reflux disease ("GERD"), and tobacco

abuse (1 pack/day for 25 years).  (Tr. 345-47).  She was treated with medication and discharged

the next day in stable condition after unremarkable lab test, x-ray, and ECG results.  (Tr. 348-

51).

On February 14, 2017, Miley visited Robert Lance Drake, DO, for a follow-up on her

hospital stay.  (Tr. 369).  Miley reported a recurrence of her symptoms, which Dr. Drake noted

were concerning for progressive ischemia and for which he ordered a nuclear stress test.  *Id.*  The

nuclear stress test results showed ischemia in the LAD distribution, and Dr. Drake performed an

angioplasty on February 21, 2017.  (Tr. 378, 384).  At an April 7, 2017, follow-up, Miley reported that she'd had no chest discomfort since the procedure but continued to smoke.  (Tr. 384-85).  The attending physician warned her that continued smoking would adversely affect her cardiac morbidity mortality and stated her need to quit smoking.  (Tr. 385).

On July 24, 2017, Miley was admitted to the emergency department after she reported feeling chest pain earlier in the day that radiated to her left arm.  (Tr. 313-15, 408).  A heart catherization showed 80% stenosis of the left anterior descending coronary ostium and a single-vessel coronary artery bypass was attempted on August 1, 2017.  (Tr. 408).  Afterwards, she was placed in the intensive care unit.  (Tr. 409).  She underwent additional post-operative procedures due to complications, including: (i) thrombectomy of the right external iliac artery and primary repair of the common femoral artery; and (ii) embolectomy of the right brachial artery and primary closure due to acute ischemia of the right arm.  *Id.*  Miley was discharged in stable condition on August 16, 2017 and transferred to an extended-care facility.  *Id.*  Her discharge diagnoses included: (1) non-ST elevation myocardial infarction; (2) coronary artery disease, status post drug-eluding stent; (3) essential hypertension; (4) hyperlipidemia; (5) ongoing tobacco use; (6) GERD; and (7) serious obesity (BMI of 37.07).  (Tr. 407).

On August 18, 2017, Miley visited OhioHealth for a follow-up on her chest staple removal, reporting that "she feels great and is ambulating without difficulty."  (Tr. 455).  She also denied shortness of breath, chest pain, or other "discomforts."  *Id.*  Upon examination, Miley's chest incision sites were healing well, but her groin incisions appeared ulcerated.  (Tr. 456).  Cultures of the groin incisions were sent for testing.  (Tr. 457).

On August 24, 2017, Miley visited Uchenna Anicetus Ezike, MD, for a consultation on groin drainage and ulceration.  (Tr. 412).  Miley reported that the area of her groin where the

embolectomy was performed had been draining and formed an ulceration.  *Id.*  Dr. Ezike noted

that the samples taken from Miley's left groin area were positive for cocci bacteria, though she

denied fever, chills, or rigors.  *Id.*  Upon examination, Miley had: (i) shallow, draining ulceration

on the right groin area that looked clean; (ii) deep, bleeding ulceration on the left groin area with

surrounding necrotic tissue; and (iii) mild edema.  (Tr. 413).  Dr. Ezike diagnosed Miley with

bilateral groin ulceration and suspicion of infection of the left groin.  (Tr. 414).

On August 30, 2017, Miley visited Rafael Eduardo Villalobos, DO, for a consultation on

her open chest and left groin wounds.  (Tr. 415).  Dr. Villalobos noted that the sternotomy areas

had wound separation without evidence of purulence or bleeding and the left groin wound had

visible hematoma with no sign of infection.  *Id.*  Dr. Villalobos recommended a vacuum assisted

closure ("VAC") dressing to the chest site and wet-to-dry dressings to the groin area to allow the

hematoma to liquify followed by a VAC dressing.  *Id.*  Miley underwent a VAC dressing of the

chest wound on September 1, 2017.  (Tr. 506).

On September 5, 2017, Miley visited Gregory Charles Heins, DO, for a follow-up on her

coronary bypass, reporting that she felt "surprisingly well," with no discomfort, dyspnea,

orthopnea, palpitations, or syncope episodes.  (Tr. 467).  Dr. Heins noted that Miley was

"recovering nicely" despite post-operative complications.  *Id.*

On September 26, 2017, Miley visited Dr. Heins for another follow-up on her coronary

bypass, reporting no symptoms suggesting angina or cardiac decompensation.  (Tr. 423).

Dr. Heins noted that Miley was progressing well; and her heart rate and blood pressure appeared

stable, and she was cleared her for closure of her chest would via plastic surgery.  *Id.*  On

September 29, 2017, Miley underwent surgery for removal of an embedded sternal wire,

debridement of the skin of the lower chest, and closure of the chest wound.  (Tr. 417).

On October 4 and 11, 2017, Miley visited Dr. Villalobos, who noted her chest was healing well post debridement.  (Tr. 504).

On October 20, 2017, Miley returned to OhioHealth for a follow-up of her right femoral artery repair.  (Tr. 427).  Miley reported that her arm and leg were asymptomatic.  *Id.*  Upon examination, the attending physician noted that Miley's right brachial incision and femoral wound had completely healed.  (Tr. 427, 430).

On October 25, 2017, Miley returned to Dr. Villalobos, reporting that she had a small opening in her chest with fluid coming out of it, though there was no associated pain or fever. (Tr. 503).  Dr. Villalobos noted a small opening in Miley's chest with no drainage or purulence. *Id.*  His plan of care was to obtain a culture sample, debridement of the wound, and local care. *Id.*  During a November 1, 2017, follow-up, Dr. Villalobos noted that the incision was smaller, shallower, and healing well, though the culture sample showed methicillin staph aureus.  *Id.*  Dr. Villalobos started Miley on clindamycin.  *Id.*  At a November 8, 2017, follow-up, Dr. Villalobos noted that Miley's chest wound was closed and healing well.  (Tr. 502).

Meanwhile, on October 31, 2017, Miley visited OhioHealth for a cardiac rehabilitation consultation.  (Tr. 796).  During her consultation, Miley reported that she'd quit smoking on July 24, 2017.  *Id.*  Goals were established, and she attended her first session on November 8, 2017, after which care was transferred to another facility.  (Tr. 796-98).

On December 11, 2017, Miley visited John Thomas Hanna, MD, for a follow-up on her coronary artery disease.  (Tr. 547).  Miley reported that her general exercise tolerance was slowly improving, but she was smoking up to three cigarettes per day and had not started her exercise program because she lived in a second-floor apartment.  *Id.*  She could, however, walk down the stairs to go outside and smoke.  *Id.*  She also reported fatigue and back pain.  *Id.*  Upon

6

examination, Miley was morbidly obese (BMI of 38.5) but otherwise unremarkable.  (Tr. 548); *see* (Tr. 21 (calculating BMI)).  She was diagnosed with hypertension and hyperlipidemia.  (Tr. 549).  Dr. Hanna noted that Miley's hypertension was "[e]xactly on track," ordered a lipid panel, recommended increased diet and exercise, and offered a statin drug.  *Id.*  Dr. Hanna also discussed the importance of not smoking.  (Tr. 547).

On January 12, 2018, Miley presented to Dr. Heins for a follow-up on her coronary bypass, reporting increasing activities as tolerated and no symptoms suggesting angina or cardiac decompensation.  (Tr. 762).  She also reported smoking one pack of cigarettes a day.  (Tr. 765).  Upon examination, Miley had unremarkable results except a BMI of 39.26.  (Tr. 766-67).  Dr. Heins noted that Miley appeared "stable," advised that she continue cardiac rehabilitation when she was able after her pending thyroidectomy, and reemphasized lifestyle modification.  (Tr. 762).  On January 16, 2018, Miley underwent a total thyroidectomy.  (Tr. 759-61).

On March 7, 2018, Miley visited Dr. Villalobos, reporting that her chest wound had opened.  (Tr. 566).  Upon examination, she had two small openings where there was some exudate of drainage.  *Id.*  An x-ray showed cardiomegaly with prior median sternotomy and coronary bypass artery graft.  (Tr. 574).

On March 16, 2018, Miley underwent an exploration of her chest wound as her chest continued to seep fluid, heal, and seep fluid again intermittently.  (Tr. 588).  Dr. Villalobos, who performed the procedure, opened her chest and removed a foreign body.  (*Id.*).  On March 21, 2018, Dr. Villalobos noted the chest wound was healing well.  (Tr. 565).

On April 2, 2018, Miley returned to Dr. Villalobos for a follow-up and reported continued drainage and increased soreness.  *Id.*  Dr. Villalobos, however, saw no sign of drainage but noted increased sensitivity in the chest area.  *Id.*

Also on April 2, 2018, Miley visited Dr. Hanna for a follow-up on her hypertension, noting she had not started an exercise regimen nor watching what she ate.  (Tr. 694).  A review of symptoms was positive for fatigue and back pain.  (Tr. 694-95).  Upon examination, she had a BMI of 40.43 but otherwise had unremarkable results.  (Tr. 695).  Dr. Hanna diagnosed her with hypothyroidism due to medication, hypertension, and obesity.  (Tr. 696).  Dr. Hanna adjusted Miley's thyroid medication and advised calorie counting and exercise to reduce weight.  (Tr. 696-97).

On April 9, 2018, Miley returned to Dr. Villalobos, and Dr. Villalobos indicated the chest wound was healing well, clean, dry, and intact, with no sign of purulence.  (Tr. 564).

On July 12, 2018, Miley presented to Dr. Hanna for a follow-up on her hypertension, reporting new onset of headaches over the previous ten days with nausea and dizziness when standing up.  (Tr. 688).  She also reported back pain and fatigue.  (Tr. 688-89).  Upon examination, Miley had unremarkable results except morbid obesity (BMI of 41.48) and myofascial triggers in both shoulders into the occipital ridge.  (Tr. 689-90).  Dr. Hanna noted that Miley's GERD was stable off of medication, her hypertension was well controlled, and advised home care methods to alleviate headaches.  (Tr. 690).

On August 30, 2018, Miley visited Christina M. Spring, CNP, reporting chest pain along the right edge of her sternum when she laid on her back or rolled to her side or when she took "a really big deep breath", fatigue, and back pain.  (Tr. 681-82).  She also reported a lump under her sternal scar that was painful to palpation.  *Id.*  And Miley reported increased stress after learning her daughter was addicted to meth and living in a house with no running water or utilities.  (Tr. 681).  Miley took custody of her four minor grandchildren and was in the process of obtaining legal guardianship while also taking the children to multiple appointments.  *Id.*  A physical

examination confirmed her lumps and sternum pain and continued obesity (BMI of 41.99).  (Tr. 682-83).  The results were otherwise unremarkable.  *Id.*  Nurse Practitioner Spring informed Miley that the lump was likely scar tissue buildup that was pulling along the edge of her ribs and advised her to massage the scar, take ibuprofen as needed, and ice the area.  (Tr. 683).

On October 23, 2018, Miley returned to Nurse Practitioner Spring for a follow-up on her hypertension, reporting that the lump on her sternum had "completely resolved" and the area was no longer painful.  (Tr. 670).  She reported she'd started doing yoga with her other daughter.  *Id.*  She was smoking one pack of cigarettes per day and was willing to try something to quit.  (Tr. 670, 675).  A review of symptoms was positive for fatigue and back pain.  (Tr. 671).  Upon examination, she had unremarkable results except morbid obesity (BMI of 41.21).  (Tr. 671-72).  Nurse Practitioner Spring adjusted Miley's thyroid medication, continued her hypertension medication, prescribed nicotine patches, advised her of the need to quit smoking, and counseled her on diet and exercise.  (Tr. 675-76).

On December 5, 2018, Miley visited Dr. Villalobos, reporting drainage from a pin-sized hole in her sternum.  (Tr. 563).  Upon examination, Dr. Villalobos noted a small wound with no drainage and assessed her with draining sinus.  *Id.*  X-ray examination showed sternal wires and mediastinal surgical clips.  (Tr. 572).  On January 4, 2019, Miley underwent surgical exploration, during which Dr. Villalobos removed two pacer wires, sutures, and sternal wires.  (Tr. 586).  During a January 9, 2019 follow-up, Dr. Villalobos noted Miley was healing well.  (Tr. 562).

On March 6, 2019, Miley returned to Nurse Practitioner Spring, reporting chills, dyspnea, facial pain, fever, myalgias, congestion, cough, sore throat, and wheezing that had begun six days earlier.  (Tr. 656).  Miley also reported getting new pets, continued smoking, and fatigue.  *Id.*  Upon examination, Miley had middle ear effusion, submandibular and tonsillar adenopathy,

and morbid obesity (BMI of 40.62).  (Tr. 657-58).  Otherwise, her physical examination results were unremarkable.  (Tr. 657).  Nurse Practitioner Spring diagnosed Miley with sinusitis, prescribed medication, advised Miley again on diet and exercise, and indicated she would schedule a pulmonary function test to rule out chronic obstructive pulmonary disease ("COPD").  (Tr. 662).  On April 2, 2019, Miley completed a sleep apnea screen that indicated she was at high risk of COPD.  (Tr. 650).

On August 1, 2019, Miley visited Nurse Practitioner Spring for a follow-up on her hypothyroid and hypertension.  (Tr. 633).  Miley reported fatigue, dizzy spells, thinning hair, dry skin, and swelling feet but had been unable to follow up with endocrinology because of illness with her husband.  *Id.*  Upon physical examination, Miley had unremarkable results except looking older than her stated age.  (Tr. 635-36).  Nurse Practitioner Spring ordered blood work, continued hypertension medication, and readvised Miley on diet and exercise (BMI of 40.23).  (Tr. 635-37).

On August 9, 2019, Miley returned to Nurse Practitioner Spring, reporting one episode of brief chest pain that went away after she took "nitro" and sat down.  (Tr. 622).  She also reported increased blood pressure, increased fatigue, and continued tobacco use.  *Id.*  Upon examination, Miley had results identical to her last visit.  (Tr. 625).  Nurse Practitioner Spring increased Miley's hypertension medication, prescribed medication for hyperlipidemia, advised her to exercise and diet, and ordered a stress test for her chest pain.  (Tr. 626-27).

On August 19, 2019, Miley underwent a SPECT scan, which showed a large, severe inferior lateral infarct with peri-infarct ischemia.  (Tr. 700).

On September 3, 2019, Miley visited Nurse Practitioner Spring, reporting no new chest pain but stated she had occasional palpitations and shortness of breath.  *Id.*  She also continued to

smoke.  *Id.*  Upon examination, Miley had unremarkable results except diminished air entry.  (Tr. 705).  Nurse Practitioner Spring ordered a coronary angiography and had a "frank" discussion with Miley about tobacco cessation, noting her prognosis was "exceedingly poor" if she didn't stop.  (Tr. 700-01).

Also on September 3, 2019, Miley underwent cardiac catherization, which showed: (i) overall 45-50% left ventricular function; and (ii) mild diffuse disease in the proximal and mid segment of the right coronary artery (20-30% stenosis).  (Tr. 708-09).  The treating physician recommended smoking cessation, an echocardiogram, and continued use of aspirin and statin. (Tr. 708).

### C.  Relevant Opinion Evidence

#### 1.  Treating Source – Christina Spring, CNP

On October 17, 2019, Nurse Practitioner Spring completed a questionnaire on Miley's physical capacity, stating that Miley could: (i) sit for 120 minutes before needing to stand; (ii) stand for 30 minutes before needing to sit down or walk around; (iii) stand/walk for up to 2 hours in an 8-hour workday and would need to change positions; (iv) occasionally lift up to 20 pounds; (v) could perform low stress work; and (vi) would be absent up to two days per month. (Tr. 555-58); *see* (Tr. 56-57).

#### 2.  State Agency Consultants

On November 7, 2017, Mehr Siddiqui, MD, evaluated Miley's physical capacity based on a review of the medical record and determined that she could perform light work.  (Tr. 81-82, 84).  Specifically, Dr. Siddiqui determined Miley could lift 20 pounds occasionally and 10 pounds frequently; sit/stand/walk 6 hours in an 8-hour workday; push/pull without limitation other than for lifting and carrying; frequently crouch, crawl, kneel, and climb ramps/stairs;

occasionally climb ladders/ropes/scaffolds; and not be exposed to hazards.  (Tr. 81-82).  On February 14, 2018, Anton Freihofner, MD, concurred with Dr. Siddiqui's assessment of Miley's physical capacity.  (Tr. 108-111).

### D.    Relevant Testimonial Evidence

At the ALJ hearing, Miley testified that she lived with her boyfriend and four minor grandchildren – an eight-year-old, a four-year-old, a three-year-old, and a two-year-old.  (Tr. 38-39).  The two-year-old stayed at home while the rest took a bus to go to school or Head Start.  (Tr. 39-40).  Miley's boyfriend worked from 3:00 p.m. to 11:00 p.m.  (Tr. 40).  Miley's daughter, sister, and mother helped take care of the children.  *Id.*  Specifically, they helped her with laundry, cleaning, and bathing and caring for the children.  (Tr. 59).

Miley testified that she still smoked and acknowledged her doctors' warnings.  (Tr. 49).  She started a smoking cessation program two months earlier, started Chantix, and had come down to six cigarettes per day.  *Id.*  She had been doing yoga and meditation with her daughter for a few months.  (Tr. 50).  Miley noticed greater flexibility and decreased pain in her hips and knees.  *Id.*

Miley testified that she had no residual symptoms from her thyroidectomy.  (Tr. 51).  Around April 2018, her boyfriend would help her shower, she'd get dressed, eat, watch television or read, and do yoga.  (Tr. 54).  When Miley took custody of her grandchildren, she was still having dizzy spells, her legs were swelling, and her chest wound continued to drain.  (Tr. 54-55).  Because of the drainage, she could not lift the children.  (Tr. 55).  Dr. Villalobos had restricted her from lifting over 15 pounds and driving, which he removed in January 2019.  *Id.*

Miley testified that she still experienced swelling in her lower extremities with prolonged standing or walking. (Tr. 57). If she sat for too long, her lower extremities would go numb. *Id.* She could stand and walk for 30 minutes and sit for up to 45 minutes. (Tr. 58). She elevated her legs above her heart 4 or 5 times per day, for up to 30 minutes at a time. *Id.* She also experienced biweekly fatigue that lasted all day. (Tr. 58-59).

Miley testified that her biggest barrier to full-time work were her cardiac symptoms. (Tr. 60). She stated that doing high stress tasks increased her blood pressure, which caused headaches and dizziness. (Tr. 60). She also felt a "bone ache," throbbing around her neck, and her heartbeat pulsing when moving around or stressed. (Tr. 62).

## III.    Law & Analysis

### A.    Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). And, even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'" *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Jones*, 336 F.3d at 477); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"). But, even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal

standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").  And the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked.").

### B.     Separation of Powers Violation

Miley argues that former-Commissioner Andrew Saul's appointment violated the principle of separation of powers because 42 U.S.C. § 902(a)(3) provides for a six-year term and makes the Commissioner removable only upon a finding of neglect of duty or malfeasance in office, which was similar to the statute held to violate the principle of separation of powers in *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183 (2020) (hereafter "*Seila Law*"). ECF Doc. 12 at 8-9.  Therefore, Miley argues that the Commissioner had no authority to carry out any functions of his office and, by extension, the ALJ had no authority to adjudicate Miley's applications, necessitating a remand.  *Id.*

The Commissioner concedes that § 902(a)(3) violates the principle of separation of powers but argues that Miley is nevertheless not entitled to a remand because, under *Collins v. Yellen*. 141 S. Ct. 1796 (2021), she has not shown that she was actually harmed by the

unconstitutional restriction on the president's removal authority.[4]  ECF Doc. 16 at 1-9.

Specifically, the Commissioner argues that Miley was not harmed because the ALJ's

appointment was ratified in July 2018 by then-Acting Commissioner Nancy Berryhill, who was

not subject to the unlawful removal provision and was presumptively removable at-will.  ECF

Doc. 16 at 2, 4-6.  The Commissioner alternatively argues, relying on Justice Kagan and

Justice Thomas's concurring opinions in *Collins*, that Miley cannot show actual harm because

she cannot show the unconstitutional removal provision inflicted compensable harm on her.

ECF Doc. 16 at 2, 6-9.  The Commissioner argues that Miley must show the president's inability

to remove Saul under the removal provision somehow affected the ALJ's decision.  This, the

Commissioner argues, Miley has not done.  ECF Doc. 16 at 6-10.

     Miley replies, in relevant part, that the Commissioner's failure to raise standing means

that she has standing to assert her constitutional argument.  ECF Doc. 17 at 1.  She further argues

that the unconstitutional nature of the removal restriction itself was sufficient harm to warrant a

remand because the ALJ and the Appeals Council issued their rulings based on policies and

regulations promulgated by Saul, including the way ALJ decisions are written and how

musculoskeletal impairments are to be evaluated.  ECF Doc. 17 at 2-3.  And, Miley argues, the

ALJ was acting under improper delegated authority as a consequence of the unlawful removal

provision.[5]  ECF Doc. 17 at 1-3.

---

[4] Because the court concludes that, under *Collins* and related caselaw, Miley lacks standing to raise her
constitutional challenge, the Commissioner's other alternative theories for why remand on this issue is not
warranted (as well as Miley's reply to those theories) are not addressed.

[5] Miley's reply brief makes a single-sentence statement that Saul was not "constitutionally appointed,"
but two sentences later states: "[t]he argument raised by Plaintiff, however, was not an [A]ppointments
[C]lause challenge."  ECF Doc. 17 at 3-4.  Any Appointments Clause challenge Miley may have
attempted to raise through her reply is forfeited – both for having raised it for the first time in reply and
for raising it perfunctorily.  *Williamson v. Recovery Ltd. P'ship*, 931 F.3d 608, 621 (6th Cir. 2013);
*Colvin v. Comm'r of Soc. Sec.*, No. 4:18CV1249, 2019 U.S. Dist. LEXIS 168743, at *11 (N.D. Ohio Sept.
30, 2019).

The judicial power of the federal courts "is limited to 'cases' and 'controversies.'" *Muskrat v. United States*, 219 U.S. 346, 356 (1911); U.S. Const. art. III § 2.  From the case-and-controversy requirement of the Constitution stems the doctrine of standing, which asks "whether the plaintiff has made out a 'case or controversy' between [herself] and the defendant within the meaning of Art. III."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 492-93 (2009).  This ordinarily requires that a plaintiff show "(1) an injury in fact (2) that's traceable to the defendant's conduct and (3) that the courts can redress."  *Gerber v. Herskovitz*, 14 F.4th 500, 505 (6th Cir. 2021).  But when a plaintiff challenges a statutory restriction on the president's power to remove an executive officer, the plaintiff can establish standing "by showing that [she] was harmed by an action that was taken by such an officer and that the plaintiff alleges was void."  *Collins*, 141 S. Ct. at 1788 n.24.

Both in *Seila Law* and *Collins*, the Supreme Court confronted separation-of-powers challenges to the structure of single-head executive agencies.  The Court first addressed the structure of the Consumer Finance Protection Bureau ("CFPB") under 12 U.S.C. § 5491(c)(3), which made the CFPB Director removable only for "inefficiency, neglect of duty, or malfeasance."  *Seila Law*, 140 S. Ct. at 2191-92.  Without addressing whether the petitioner had standing to bring its separation-of-powers argument in the district court in the first instance,[6] the Court held that § 5491(c)'s restrictions on the president's authority to remove the single head of the CFPB violated the principle of separation of powers.  *Id.* at 2197.

The Court then addressed the structure of the Federal Housing Finance Agency ("FHFA") under 12 U.S.C. § 4512(b)(2), which made the Director of the FHFA removable by

---

[6] *Seila Law* instead determined that the petitioner had appellate standing because (1) the petitioner had been compelled to comply with a civil investigative demand from the CFPB and provide documents it would prefer not to, (2) the injury was traceable to the appellate court's decision, and (3) the injury would be redressed by a reversal of the appellate court's decision.  140 S. Ct. at 2196.

the president only "for cause." *Collins*, 141 S. Ct. at 1770.  The challenge came to the Court

after the FHFA amended the formula used to calculate the amount of dividends Fannie Mae and

Freddie Mac were required to pay to the U.S. Department of the Treasury.  *Id.* at 1774-75.  The

Court determined first that the companies' shareholders had standing to bring their constitutional

claim because: (1) the FHFA transferred the value of their property rights in the companies (their

net worth) to the Treasury via the variable dividend formula, constituting an injury in fact;

(2) the injury was traceable to the FHFA's adoption and implementation of the amendment; and

(3) the injury was potentially redressable.  *Id.* at 1779.  The Court concluded that a

straightforward application of *Seila Law* led to the conclusion that § 4512(b)(2)'s removal

restrictions also violated the principle of separation of powers.  *Id.* at 1783-84.  Justice Kagan,

somewhat prophetically, predicted the structure of the SSA would be "next on the chopping

block."  *Id.* at 1802 (Kagan, J., concurring).

Miley lacks standing to challenge the constitutionality of the SSA's structure.  Miley

reads the Commissioner's brief as addressing only the merits of her constitutional claim, which

she contends establishes she has standing.  ECF Doc. 17 at 1.  Although the Commissioner

doesn't use the word "standing," she argues that Miley has not established a "nexus" between 42

U.S.C. § 902(a)(3)'s removal restrictions and an alleged harm.  *See* ECF Doc. 16 at 3-9.  And

although intermingled with arguments concerning the relief Miley could obtain, the

Commissioner has effectively argued that Miley has not met the traceability requirement for

standing.  Moreover, "[a]s a jurisdictional requirement, standing … *cannot be waived or

forfeited*." *Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1951 (2019) (emphasis

added).  And the court can raise standing on its own even when the parties don't.  *Loren v. Blue

Cross & Blue Shield*, 505 F.3d 598, 607 (6th Cir. 2007); *e.g.*, *Keyes v. Banks*, No. 20-6034, ___

F. App'x ___, 2021 U.S. App. LEXIS 17966, at *4 (6th Cir. June 15, 2021) (unreported);

*Lindenbaum v. Energy Servs. Providers*, No. 1:21-CV-00764, 2021 U.S. Dist. LEXIS 133363, at

*9 (N.D. Ohio July 19, 2021); *Walker v. United States*, No. 1:20-CV-01392, 2021 U.S. Dist.

LEXIS 50779, at *12 (N.D. Ohio Mar. 18, 2021).

     Miley argues that she has standing because her administrative proceedings were

conducted pursuant to policies and regulations implemented by Saul.  ECF Doc. 12 at 9; ECF

Doc. 17 at 3.  But that's not enough.  "[T]he unlawfulness of the removal provision does not strip

the [Commissioner] of the power to undertake the other responsibilities of his office."  *Collins*,

141 S. Ct. at 1788 n.23.  As Justice Thomas's concurring opinion clarifies, Miley must do more

than point to a conflict between 42 U.S.C. § 902(a)(3) and the Constitution; she must show some

action on the part of Saul that was unlawful and harmful to her.  *See id.* at 1790-91 (Thomas, J.,

concurring).  More to the point, Miley must show that the policy and regulatory changes

implemented by Saul adversely affected her.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555,

559 n.1 (1992) ("[T]he injury must affect the plaintiff in a personal and individual way.").  She

has pointed to changes in the Hearings, Appeals and Litigation Law Manual and the way

musculoskeletal impairments are evaluated, but she has not argued how those changes made it

more or less likely that her applications would be denied.  ECF Doc. 17 at 3.  Miley's near-total

focus on her cardiac and obesity impairments demonstrates the disconnect between her claims

and any alleged deficiencies in how SSA evaluates musculoskeletal impairments.  This is in stark

contrast to the shareholders in *Collins*, who identified an injury (the loss of net worth in

companies in which they owned shares) traceable to the Director's unlawful action (amending

the formula to calculate dividends).  141 S. Ct. at 1779.  Without a harm traceable to an unlawful

action by the Commissioner, Miley does not have standing to challenge the constitutionality of

§ 902(a)(3).  *See S.W. v. Comm'r of Soc. Sec.*, No. 3:20-cv-05602, 2021 U.S. Dist. LEXIS 219306, at *20-21 (W.D. Wash. Nov. 12, 2021) (concluding similarly).

**C.    Step Three: Obesity[7]**

Miley argues that the ALJ failed to apply proper legal standards in considering her obesity impairment at Step Three of the sequential evaluation process.  ECF Doc. 12 at 10-11.  Specifically, Miley argues that the ALJ failed to comply with the requirements of SSR 19-2p by not adequately explaining how the ALJ considered her obesity.  *Id.*

The Commissioner responds that Miley's challenge to the how the ALJ evaluated her obesity is groundless because the ALJ expressly considered her obesity at every step of her evaluation and explained why additional functional limitations were not warranted.  ECF Doc. 18 at 14.  The Commissioner also argues Miley has not identified evidence that would support greater RFC restrictions on account of her obesity.  ECF Doc. 18 at 14-15.

Miley has not further developed this issue in her reply brief.  *See generally* ECF Doc. 19.

At Step Three of the sequential evaluation process, the claimant has the burden to prove that she has an impairment or combination of impairments that meet or medically equal a listed impairment.  *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. § 404.1520(a)(4)(iii).[8]  If the claimant meets all of the criteria for a listed impairment, she is disabled; otherwise, the evaluation process proceeds to Step Four.  20 C.F.R. § 404.1520(d)-(e);

---

[7] For ease of analysis, the disparate arguments scattered across the second and third argument subsection in Miley's merits brief are reorganized to fit within the five-step analytical framework for Social Security cases.  Any arguments that might be lost in the distillate are forfeited for insufficient articulation.  *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."); *Emerson v. Novartis Pharms. Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011) (agreeing with the Seventh Circuit that judges are not truffle-hunting pigs).

[8] Although this case concerns both DIB and SSI benefits, the regulations that govern them are nearly identical; thus, we will cite only to the regulations governing DIB applications.  *Compare* 20 C.F.R. § 404.1501 *et seq.*, *with* 20 C.F.R. § 416.901 *et seq.*

*Bowen v. Yuckert*, 482 U.S. 137, 141 (1987).  Although obesity is not a listed impairment, the functional limitations it causes, alone or in combination with other impairments, may medically equal a listing, such as by increasing the severity of a coexisting or related impairment.  *See* SSR 19-2p, 2019 SSR LEXIS 2, at *11.

The ALJ applied proper legal standards in her evaluation of Miley's obesity at Step Three.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  The ALJ expressly considered Miley's obesity, citing evidence which confirmed that she was obese during the period under adjudication.  (Tr. 19).  But the ALJ found that Miley's obesity "does not, either alone or in combination with other impairments, rise to the level of severity necessary to meet or equal a listing."  *Id.*  That was sufficient consideration to comply with SSR 19-2p at Step Three.  *Cf. Austin v. Comm'r of Soc. Sec.*, 714 F. App'x 569, 574 (6th Cir. 2018).  Moreover, Miley has not identified what listing she thinks she met or medically equaled when taking into account her obesity, explained what the requirements of any such Listing would have been, or explained on what basis she believes her obesity warrants a finding that she met or medically equaled a listed impairment.  This failure dooms the claim.  *McPherson*, 125 F.3d at 995-96.

Insofar as Miley challenges the ALJ's consideration of her obesity in making the ALJ's RFC determination, SSR 19-2p requires the ALJ to consider the limiting the effects of obesity on her RFC.  And the regulation requires an explanation: "As with any other impairment, we will explain how we reached our conclusion on whether obesity causes any limitations."  SSR 19-2p, 2019 SSR LEXIS 2, at *12-13.  The ALJ expressly did so, explaining that she considered Miley's obesity's effects in assessing Miley's RFC.  (Tr. 19).  And at Step Four, the ALJ expressly discussed Miley's obesity in her analysis of Miley's subjective symptom complaints.  (Tr. 24).  Certainly, the ALJ could have said more than she did about why Miley's obesity did

not meet a Listing when it was considered in combination with other impairments, but this court's role is not to ensure that everything that can be said on a topic gets said in an ALJ decision; it is to ensure that what is said is supported by substantial evidence.  And when an ALJ reaches a negative conclusion about whether a claimant's conditions meet or medically equal a Listing, the regulations do not require the ALJ to prove a negative in the way Miley argues.  And with only a bare assertion that the ALJ's analysis of her obesity was inadequate, Miley has not met her "burden of showing specifically how [her] obesity, in combination with other impairments, limited [her] ability to a degree inconsistent with the ALJ's RFC."  *Lumpkin v. Comm'r of Soc. Sec.*, No. 1:20-CV-01849, 2021 U.S. Dist. LEXIS 208622, at *21 (N.D. Ohio Oct. 6, 2021) (alterations in original) (quotation marks omitted).  Therefore, the court finds no error in the ALJ's consideration of Miley's obesity.

### D.    Step Three: Listings Explanation

Miley argues that the ALJ also failed to apply proper legal standards at Step Three of the sequential evaluation process by not adequately explaining her Listings findings.  ECF Doc. 12 at 11-12.  Miley argues that the ALJ gave no explanation for her Listings findings other than to note that Miley had hypertension, and she argues that the ALJ failed to consider Listing 8.04.  ECF Doc. 12 at 11.  She argues the ALJ's failure to consider Listing 8.04 was harmful because the evidence showed that she had an unhealed wound for more than three months despite continuing treatment.  ECF Doc. 12 at 12; ECF Doc. 19 at 1.

The Commissioner responds that the ALJ's failure to discuss Listing 8.04 was not reversible error because Miley did not produce evidence showing that she satisfied the Listing criteria.  ECF Doc. 18 at 9 - 11.  Specifically, the Commissioner argues that the Listing requires lesions in multiple body sites, and the evidence did not indicate that Miley's groin ulceration

persisted for more than three months.  ECF Doc. 18 at 10.  The Commissioner further argues Miley does not meet Listing 8.04 because she has not identified evidence of a "very serious limitation" as a result of the infected and slow-healing chest wound.  ECF Doc. 18 at 10-11.

In evaluating whether a claimant meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful review."  *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (noting that, without such analysis, it is impossible for a reviewing court to determine whether substantial evidence supported the decision).  The ALJ "need not discuss listings that the [claimant] clearly does not meet, especially when the claimant does not raise the listing before the ALJ."  *Sheeks v. Comm'r of SSA*, 544 F. App'x 639, 641 (6th Cir. 2013).  "If, however, the record raises a substantial question as to whether the claimant could qualify as disabled under a listing, the ALJ should discuss that listing."  *Id.* at 641.

### 1.    Listings 3.02 and 4.04

The ALJ's analysis of Listings 3.02 and 4.04 was arguably deficient, given the ALJ's limited, one-sentence statement that she considered them.  *Reynolds*, 424 F. App'x at 416; (Tr. 18-19).  But Miley's challenge to the ALJ's evaluation of these Listings is just as perfunctory.  ECF Doc. 12 at 11.  She does not identify the criteria for Listings 3.02 and 4.04, point to evidence she contends would support a finding that she met or medically equaled these Listings, or even argue that the ALJ should have found she met or medically equaled these Listings.  ECF Doc. 12 at 11.  The court finds, therefore, that Miley has not established a basis for remand on account of any alleged error in the ALJ's evaluation of Listings 3.02 and 4.04.  *McPherson*, 125

22

F.3d at 995-96; *Cheuvront v. Comm'r of Soc. Sec.*, No. 5:19-cv-00360, 2019 U.S. Dist. LEXIS 219678, at *50 (N.D. Ohio Dec. 23, 2019).

### 2. Listing 8.04

Listing 8.04 considers whether the claimant has "[c]hronic infections of the skin or mucous membranes, with extensive fungating or extensive ulcerating skin lesions that persist for at least 3 months despite continuing treatment as prescribed." 20 C.F.R. pt. 404, Subpt. P., App. 1 § 8.04. Extensive skin lesions "are those that involve multiple body sites or critical body areas, and result in a very serious limitation." *Id.* § 8.00C1.

The ALJ applied proper standards in her evaluation of the Listings at Step Three of the sequential evaluation process. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. Miley contends she meets Listing 8.04 based on evidence of her chest and left groin wounds. ECF Doc. 12 at 11-12. But the evidence related to her chest and groin wounds is insufficient to establish the durational or the severity criteria for Listing 8.04. Before explaining why, we note that Listing 8.04 is not limited – as the Commissioner argues – to skin lesions affecting *multiple* body sites. It includes lesions affecting multiple body sites *or* critical body areas. 20 C.F.R. pt. 404, Subpt. P., App. 1 § 8.00C1. The disjunctive "or" separating nouns modified by "multiple" and "critical" suggests that the Listing can be satisfied by a lesion that affects a single critical area of the body. This reading is supported by the examples given by the Listing, which state that skin lesions in the perineum could satisfy the Listing if they very seriously limited the claimant's ability to ambulate. *Id.* § 8.00C1c.

Returning to the merits, the record evidence only documents Miley's groin ulcers on August 18, August 24, and August 30, 2021. (Tr. 412-13, 415, 455-56). Because there is no evidence that her groin ulcers persisted for at least three months despite treatment, the record

does not raise a substantial question as to whether she met or equaled Listing 8.04 on account of her groin ulcers.  20 C.F.R. pt. 404, Subpt. P., App. 1 § 8.04; *see Pasiak v. Comm'r of Soc. Sec.*, 800 F. App'x 301, 306 (6th Cir. 2019) (stating that in order to raise a substantial question as to whether a Listing was satisfied, a claimant must "point to specific evidence that demonstrates [she] reasonably could meet or equal every requirement of the [L]isting" (quotation marks omitted)).

Miley's chest wound also does not satisfy Listing 8.04's durational requirement.  From August 30, 2017 – when her chest wound was initially treated – through October 25, 2017, no purulence or infection was noted.  *See* (Tr. 415, 423, 503-04).  And although Dr. Villalobos's November 1, 2017 treatment notes stated that the culture sample from Miley's chest showed methicillin staph aureus, he noted on November 8, 2017 that it was healing nicely.  (Tr. 502-03). Miley did not report symptoms associated with her chest wound again until March 7, 2018, but treatment notes from that day onwards do not show a skin infection or that Miley was treated for skin infection on her chest.  (Tr. 562-65, 588); *see also* (Tr. 622-25, 633-36, 656-60, 670-73, 682-83, 685-86, 688-93, 703-05).  Because the evidence does not establish that Miley's chest wound also suffered from chronic infections, the record does not raise a substantial question as to whether she met Listing 8.04 on account of her chest wound.[9]  20 C.F.R. pt. 404, Subpt. P., App. 1 § 8.04; *see Pasiak*, 800 F. App'x at 306.

Because the record does not raise a substantial question as to whether Miley met or equaled Listing 8.04, the ALJ was not required to discuss or analyze it.  *See Sheeks*, 544 F.

---

[9] Insofar as Miley meant to argue that her groin ulcers and chest wound medically equaled the criteria of Listing 8.04, that issue is forfeited because she does not explain how the evidence shows that her groin ulcers and chest wound resulted in "very serious" limitations.  20 C.F.R. pt. 404, Subpt. P., App. 1 § 8.00C1; *McPherson*, 125 F.3d at 995-96.

24

App'x at 641-42.  Thus, the ALJ did not fail to apply proper legal standards in her Step Three evaluation.

### E.     Step Four: Weighing Opinion Evidence

Miley argues that the ALJ failed to apply proper legal standards or reach a decision supported by substantial evidence in her evaluation of Nurse Practitioner Spring's opinion.  ECF Doc. 12 at 16-17.  Miley argues the ALJ wrongly discounted Nurse Practitioner Spring's opinion for being inconsistent with other opinion evidence because the other opinion evidence was from state agency consultants, who did not have post-opinion evidence.  ECF Doc. 12 at 17.  She therefore argues that the ALJ erred by discounting Nurse Practitioner Spring's opinion without providing a coherent explanation or citing contemporaneous evidence to support the ALJ's finding.  ECF Doc. 12 at 17; ECF Doc. 19 at 2-3.

The Commissioner disagrees, arguing that the ALJ properly discounted Nurse Practitioner Spring's opinion for lack of supportability and consistency.  ECF Doc. 18 at 16-18.

At Step Four of the sequential analysis laid out in the regulations, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record. 20 C.F.R. § 404.1520(e).  In doing so, the ALJ is required to "articulate how [she] considered the medical opinions and prior administrative medical findings."  20 C.F.R. § 404.1520c(a).  At a minimum, the ALJ must explain how she considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors.  20 C.F.R. § 404.1520c(b)(2)[10].  According to the regulation, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical

---

[10] Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record.  20 C.F.R. § 404.1520c(c)(3)-(5).

opinion will be.  This is the consistency standard.  And the regulation specifies that the more

relevant the objective medical evidence and supporting explanations presented by a medical

source are to support his or her medical opinion, the more persuasive the medical opinion will

be.  This is the supportability standard.  *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

The ALJ applied proper legal standards and reached a decision supported by substantial

evidence in her evaluation of the opinion evidence.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.

The ALJ's evaluation of Nurse Practitioner Spring's opinion complied with regulatory

requirements because the ALJ discussed both the consistency and supportability of Nurse

Practitioner Spring's opinion.  (Tr. 25).  The ALJ explained that she found Nurse Practitioner

Spring's opinion unsupported because although Nurse Practitioner Spring noted Miley's history

of right shoulder pain, fatigue, leg swelling, and dizziness, her physical examinations of record

did not support the presence of such symptoms regularly, and she pointed out that the physical

exams were "largely unremarkable."  (Tr. 25).  Moreover, as pointed out by the ALJ, Nurse

Practitioner Spring provided no explanation and cited no supporting treatment records for her

sitting, standing, walking, or absence-related limitations.  (Tr. 25).  These explanations were

sufficient to demonstrate that the ALJ considered the supportability of Nurse Practitioner

Spring's opinion.  And they satisfied 20 C.F.R. § 404.1520c(c)(1).

In addition, the ALJ explained that she found Nurse Practitioner Spring's opinion to be

inconsistent with the other opinion evidence of record, referring to the opinion of the state

agency consultants.  (Tr. 24-25); *see* 20 C.F.R. § 404.1520c(c)(2).  Although the ALJ's

consistency finding was not elaborate (the ALJ merely stated, "[T]he other medical opinion

evidence of record does not support the presence of Ms. Spring's assessed limitations, rendering

Ms. Springs *[sic]* assessment unpersuasive due to lack of . . . consistency."  (Tr. 25)), it was
sufficient.

Although Miley challenges the ALJ's reliance on the state agency consultants' opinions
on the basis that they did not consider later-received medical records, the ALJ did not err by
doing so, because the ALJ expressly contrasted their opinions with post-opinion evidence.  (Tr.
24-25); *see Spicer v. Comm'r of Soc. Sec.*, 651 F. App'x 491, 493-94 (6th Cir. 2016) (noting that
an ALJ may rely on opinion evidence from a source that did not have access to later-submitted
evidence so long as there is "some indication" that the ALJ considered that fact before finding
the earlier opinion more persuasive).

Independent review also leads to the conclusion that the ALJ's reasons for finding Nurse
Practitioner Spring's opinion unpersuasive were supported by substantial evidence.  Substantial
evidence supported the ALJ's supportability finding because Nurse Practitioner Spring's opinion
consisted of a questionnaire in which she listed Miley's diagnoses and symptoms and circled or
checked boxes pertaining to various functional limitations.  (Tr. 555-58).  Also, Nurse
Practitioner Spring did not provide any explanation for why Miley's impairments resulted in the
level of restrictions assessed in the opinion.  *Id.*  And Nurse Practitioner Spring's objective
examination findings were, as the ALJ noted, largely unremarkable and did not regularly
document the presence of shoulder pain, fatigue, leg swelling, and dizziness.  (Tr. 622-25, 633-
36, 656-57, 670-72, 682-83, 700, 704-05).

Substantial evidence also supported the ALJ's finding that Nurse Practitioner Spring's
opinion was inconsistent with other objective examination findings of record, which included:
(i) Dr. Hanna's December 11, 2017, April 2, 2018, and July 12, 2018 treatment notes; and
(ii) Dr. Hines's January 12, 2018 treatment notes.  (Tr. 547-48, 688-90, 694-95, 765-67).  And as

the ALJ noted, Nurse Practitioner Spring's opinion was inconsistent with the opinion of the other opinion evidence, as the state agency consultants assessed lesser sitting/standing/walking limitations and no positional-change or absence-tolerance requirements. *Compare* (Tr. 81-82, 108-11), *with* (Tr. 555-58).

Because the ALJ's weighing of Nurse Practitioner Spring's opinion complied with the regulations and was supported by substantial evidence, the ALJ's finding that her opinion was unpersuasive fell within the Commissioner's zone of choice and must, therefore, be affirmed. *Biestek*, 139 S. Ct. at 1154; *Jones*, 336 F.3d at 476; *Rogers*, 486 F.3d at 241; 42 U.S.C. § 405(g).

### F. Step Four: Subjective Symptom Complaints

Miley argues that the ALJ failed to apply proper legal standards or reach a decision supported by substantial evidence in the ALJ's evaluation of Miley's subjective symptom complaints. ECF Doc. 12 at 13-15, 19-20. Miley argues that the ALJ failed to provide proper legal standards by not articulating "any rationale beyond the boilerplate paragraph finding that Miley's symptoms were not entirely consistent with the medical record." ECF Doc. 12 at 19. Miley argues the ALJ disregarded: (i) Miley's testimony about her surgeries, dizzy spells, leg swelling, numbness when sitting, need to elevate her legs, fatigue, inability to lift her grandchildren, and need for assistance in caring for her grandchildren; (ii) the results of her SPECT scan; (iii) the residual effects of Miley's cardiovascular problems and healing difficulties; and (iv) Miley's disabling pain and its effects on her ability to sustain attention and concentration. ECF Doc. 12 at 13-15, 19-20; ECF Doc. 19 at 3. Miley argues the ALJ's subjective symptom evaluation was insufficient to allow for meaningful review because the ALJ failed to build an accurate and logical bridge between the evidence and the result. ECF Doc. 12 at 14-15.

28

The Commissioner disagrees, arguing that the ALJ adequately explained her RFC findings. ECF Doc. 18 at 15, 18-19-22.

As stated above, at Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 404.1520(e). The RFC is an assessment of a claimant's ability to do work despite her impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)). "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 SSR LEXIS 5. Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. § 404.1529(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5. If an ALJ discounts or rejects a claimant's subjective complaints, she must clearly state her reasons for doing so. *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). Specifically, the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess" how the ALJ evaluated the claimant's symptoms. SSR 16-3p, 2016 SSR LEXIS 4 *26 (Mar. 16, 2016).

The ALJ applied proper legal standards and reached a decision supported by substantial evidence in her evaluation of Miley's subjective symptom complaints. 42 U.S.C. § 405; *Rogers*, 486 F.3d at 241. The ALJ complied with the regulations by: (1) expressly considering all of Miley's symptoms in light of the medical evidence, other evidence, and Miley's statements regarding her symptoms; and (2) clearly explaining that she rejected Miley's subjective symptom complaints because her statements regarding the intensity, persistence, and limiting effects of her

symptoms were not consistent with the objective evidence.  20 C.F.R. § 404.1520(e); SSR 16-3p, 2016 SSR LEXIS 4, at *9-10; (Tr. 20-24).  Miley's contention that the ALJ disregarded evidence is belied by the record.  The ALJ expressly summarized Miley's testimony, including her testimony regarding her 2017 surgery, her wound healing issues, the assistance she received in caring for her grandchildren, her dizzy spells, and the need to raise her legs over her heart.  (Tr. 20-21).  The ALJ cited and summarized the SPECT scan results.  (Tr. 23) (discussing Tr. 700)).  And the ALJ analyzed the impact of Miley's cardiac symptoms on her ability to function, finding that they were well controlled with medication.  (Tr. 25).  Although Miley contends the ALJ should have analyzed the effect of her pain (the need to lift her legs above her heart and leg swelling) on her ability to sustain attention and concentration, the ALJ expressly considered these claims and rejected them as not supported by the record.  ECF Doc. 12 at 15; (Tr. 25).

Contrary to Miley's contention that the ALJ gave only a boilerplate explanation for her findings, the ALJ provided sufficiently clear reasons for rejecting Miley's subjective symptom complaints when she stated that: (1) Miley's cardiac dysfunction was well managed with medication despite minimal post-operative cardiac rehabilitation therapy and more recent evidence of chest pain; (2) Miley continued to smoke despite being advised to quit; (3) Miley's reports of fatigue, dizziness, and lower extremity swelling and then need to raise her legs were not supported by the record; and (4) her activities of daily living (yoga, meditation exercises, and providing primary childcare for four grandchildren) were inconsistent with the severity of her alleged symptoms.  (Tr. 24-25).

And the ALJ's reasons for discounting Miley's subjective symptom complaints were supported by substantial evidence.  Miley did not report cardiac symptoms subsequent to her rehabilitation other than those related to her wound until August 9, 2019 and even then, she was

30

treated primarily with medication.  *See* (Tr. 547-49, 622, 625-27, 633, 636-37, 656,661-63, 670, 675-76, 681-83, 688-90, 694-95, 708, 762).  The record repeatedly notes Miley's continued smoking despite the advice of her doctors.  (Tr. 49, 385, 547, 662, 675, 701, 763).  Miley's complaints of lower extremity swelling were inconsistent with objective examination results through September 3, 2019 finding no edema and which did not document a need to elevate her legs above her heart.  (Tr.548, 657, 671, 682, 689, 695, 705, 766).  Miley's fatigue and dizziness symptoms were not regularly reported.  (Tr. 413, 704, 765 (neither fatigue nor dizziness)); (Tr. 547, 657, 671, 682, 688, 694 (only fatigue)); (Tr. 625, 635 (fatigue and dizziness)).  And Miley stated at the ALJ hearing and told her treatment providers that she did yoga and meditation exercises and was the primary care provider for her grandchildren.  (Tr. 38, 50, 54, 681).

In short, the ALJ's analysis followed the framework set out in the regulations, was supported by substantial evidence, and was sufficient to draw and accurate and logical bridge between the evidence and the result.  *Fleischer*, 774 F. Supp. at 877; *Rogers*, 486 F.3d at 241; SSR 16-3p, 2016 SSR LEXIS 4; 20 C.F.R. § 404.1520(e).

## IV.    Conclusion

Because Miley lacks standing to raise her constitutional challenge and because the ALJ otherwise applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Miley's applications for DIB and SSI is affirmed.

**IT IS SO ORDERED.**

Dated: December 22, 2021

Thomas M. Parker
United States Magistrate Judge